Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com
Lily E. Hough (SBN 315277)
lhough@edelson.com
EDELSON PC
123 Townsend Street
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

*Counsel for Plaintiff and the Putative Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHAEL BOUVY, | Case No.: **'19CV881  DMS BLM** |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR:** |
| v. | **Violations of the Employee Retirement Income Security Act of 1974** |
| ANALOG DEVICES, INC., a Massachusetts company, as successor to LINEAR TECHNOLOGY CORPORATION, EILEEN WYNNE, STEVE MARSEY, DONALD ZERIO, and DOE DEFENDANTS 1 – 20, | DEMAND FOR JURY TRIAL |
| Defendants. | |

Plaintiff Michael Bouvy, by and through his attorneys, alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys:

**NATURE OF THE ACTION**

1.      This is a class action brought on behalf of participants in the Linear Technology 401(k) Plan (the "Plan") against Defendants (defined herein) for violations of their fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA").

2.      Plaintiff was a participant in the Plan during the Class Period (defined below). Plan participants are limited to the investment options selected for the Plan by its fiduciaries. Defendants are "fiduciaries," as that term is defined under Section 3(21)(A) of ERISA, with a duty to act solely in the interest of the Plan's participants and beneficiaries (the duty of loyalty) and to exercise the required skill, care, prudence, and diligence in administering the Plan and Plan assets (the duty of prudence).

3.      Plaintiff's claims arise from Defendants' breach of their duties of loyalty and prudence to the Plan and its participants and beneficiaries by failing to diligently evaluate and monitor the investment options in its portfolio for both performance and cost. As indicated below, the funds selected and retained by Defendants had fees that were often multiples higher than the amounts they should have been. In failing to review the investment options and make changes in a timely manner, Defendants caused participants to pay excessive and unreasonable fees, costing millions of dollars of losses in their retirement savings.

4.      Specifically, Plaintiff alleges in Count I that Defendants breached their fiduciary duties by: (1) failing to adequately review the investment portfolio of the Plan to ensure that each investment option was prudent, both in cost and performance; (2) failing to assess how the lower cost share class equivalents of the Plan's mutual funds could be used to avoid the Plan's excessive fees; and (3) failing to remove higher-cost, underperforming investment options when lower-cost alternative investments were known (or should have been known) and were readily

available on the market.

5.     Plaintiff alleges in Count II that Defendants breached their fiduciary duties by failing to adequately review the Plan's total costs to ensure that the fees paid to service providers were not unreasonable or excessive.

6.     Plaintiff alleges in Count III that certain of the Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of the Plan's assets was delegated, despite the fact that such Defendants knew or should have known that such other fiduciaries were failing to manage the Plan in a prudent and loyal manner.

7.     Defendants' failure to rein in the Plan's costs caused significant losses to Plaintiff and the class members. As a result of Defendants' fiduciary breaches, the Plan has incurred substantial damages, including the erosion of millions of dollars of retirement savings and anticipated retirement income for the Plan's participants. This action seeks these losses to the Plan for which Defendants are liable pursuant to 29 U.S.C. §§ 1109 and 1132.

8.     Because the information and documents underlying Plaintiff's claims are, for the most part, solely in Defendants' possession, certain of Plaintiff's allegations are based upon information and belief. At such time as Plaintiff has had the opportunity to conduct sufficient discovery, Plaintiff may, to the extent necessary and appropriate, further amend this Complaint.

## PARTIES

### Plaintiff

9.     Plaintiff Michael Bouvy is a resident of Apple Valley, Minnesota. He was employed by Linear Technology from 2007 until October 2018 (including after the company merged with Analog Devices, as explained below), when he resigned from his position. He is a "participant" in the Linear Technology Corporation 401(k) Plan within the meaning of 29 U.S.C. § 1002(7), and his account was invested in the funds described below during the applicable Class Period (defined below).

**The Plan**

10.     Linear Technology Corporation ("Linear Technology") is a technology company that supplies integrated circuits used in electronic equipment. Until March 2017, Linear Technology employed over 4,000 employees and operated design centers nationwide. Linear Technology provided retirement benefits to eligible employees during the applicable Class Period (defined below) under the Linear Technology Corporation 401(k) Plan (the "Plan").

11.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34).

12.     The Plan is a qualified plan under 26 U.S.C. § 401, commonly referred to as a "401(k) plan."

13.     On or around March 10, 2017, the assets and operations of Linear Technology were merged with Analog Devices Corporation ("Analog Devices"), a competing technology company with an overlapping product line. Analog Devices acquired the bulk of Linear Technology's assets and equipment and now employs many of Linear Technology's workers. Analog Devices continued Linear Technology's brand, which still exists to sell Linear Technology's power-management products but does not exist as a separate division.

14.     Before the merger, Linear Technology was the "Plan Sponsor" within the meaning of 29 U.S.C. § 1002(16)(B) and the "Plan Administrator" under 29 U.S.C. § 1002(16)(A), controlling and managing the operation and administration of the Plan.

15.     After the merger, the Plan remained active through at least the end of 2017 and Analog Devices succeeded Linear Technology in its capacity as a Plan fiduciary. At the time of the merger, there were approximately 2,369 participants in the Plan. On information and belief, those participants became vested members of the Analog Devices 401(k) Plan.

**Defendants**

16.     Linear Technology Corporation is a surrendered corporation organized and existing, from the start of Class Period until June 8, 2017, under the laws of the State of

California.

17.     Analog Devices Inc. is a corporation organized and existing under the laws of the Commonwealth of Massachusetts. As a continuation of Linear Technology's operations, Analog Devices took on Linear Technology's fiduciary liabilities as the "Plan Sponsor" and "Plan Administrator" when the companies merged.

18.     As "Plan Administrator" during the Class Period, Linear Technology had authority to appoint and delegate discretionary authority to an advisory committee to control and manage the operation and administration of the Plan.

19.     The current and former members of that committee and any individual or entity to whom it delegated any of its fiduciary functions, the nature and extent of which have not been disclosed to Plaintiff, are also fiduciaries of the Plan under 29 U.S.C. § 1002(21) because they exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan. Because those entities and individuals are currently unknown to Plaintiff they are collectively named as Doe Defendants 1-10 and referred to herein as "Doe Defendant Plan Administrators."

20.     Defendant Eileen Wynne was the Vice President and Chief Accounting Officer of Analog Devices from 2015 to present. In 2017, Wynne had the authority to amend or modify any or all provisions of the Plan. This authority gave her discretionary authority and control over Plan assets, rendering her a fiduciary under 29 U.S.C. § 1002(21)(A). Pursuant to this authority, in 2017, Wynn signed the Plan's Form 5500, filed with the Department of Labor.

21.     Defendant Steve Marsey was the Human Resources Director for Linear Technology prior to 2012 and at least until March 10, 2017, when Linear Technology was acquired by Analog Devices. In 2012, 2013, 2014, and 2016, Marsey had the authority to amend or modify any or all provisions of the Plan. This authority gave him discretionary authority and control over Plan assets, rendering him a fiduciary under 29 U.S.C. § 1002(21)(A). Pursuant to this authority, in 2012, 2013, 2014, and 2016, Marsey signed the Plan's Form 5500, filed with the

Department of Labor.

22.     Defendant Donald Zerio was the Vice President and Chief Financial Officer of Linear Technology from November 2014 to July 2017. In 2015, Zerio had the authority to amend or modify any or all provisions of the Plan. This authority gave him discretionary authority and control over Plan assets, rendering him a fiduciary under 29 U.S.C. § 1002(21)(A). Pursuant to this authority, in 2015, Zerio signed the Plan's Form 5500, filed with the Department of Labor.

23.     Any individual or entity to whom Defendants delegated any of their fiduciary functions or responsibilities are also fiduciaries of the Plan under 29 U.S.C. §§ 1002(21)(A) and 1105(c)(2). Because the individuals and/or entities that have been delegated fiduciary responsibilities by Defendants are not currently known to Plaintiff, they are collectively named as Doe Defendants 11-20.

24.     Each Defendant identified above as a Plan fiduciary is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)-(3) because it enabled other fiduciaries to commit breaches of fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2) and (3).

26.     This district is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district in which the subject plan was administered, where at least one of the alleged breaches took place, and where at least one defendant may be found.

## FACTUAL ALLEGATIONS

**I.      401(K) PLANS AND HIDDEN FEES**

**A.      401(k) Plans**

27.     Defined contribution plans that are qualified as tax-deferred vehicles under

Section 401 of the Internal Revenue Code, 26 U.S.C. §§ 401(a) and (k) (*i.e.*, 401(k) plans) have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system. Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement.[1]

28.     In a defined contribution plan, employees are limited to the investment options selected by the plan's fiduciaries. The employer (or other designated fiduciary) is obligated to assemble a diversified menu of investment options. Plan participants may invest in any of these "designated investment alternatives" that are included within the plan's menu of investment options.[2] Each investment alternative within a defined contribution plan is generally a pooled investment product managed by a professional fund manager, such as a mutual fund, collective investment trust, or separate account.

29.     Mutual funds consist of a pool of funds collected from many investors for the purpose of investing in a portfolio of equities, bonds, and other securities. Three types of mutual funds commonly seen in 401(k) plans include money market funds, balanced funds, and target-date funds. Money market funds invest in the money markets, i.e., debt securities of a short-term nature, such as U.S. Treasury bills. Balanced funds invest in a mix of stocks and bonds. Target-date funds assemble a broad portfolio of investments from different asset classes at a risk level that declines over time as the targeted retirement date approaches.

30.     Pooled investment products such as mutual funds offer investors exposure to a particular asset class. The broad asset classes generally include fixed investments (e.g., money market funds, guaranteed investment contracts, and stable value funds), bonds (i.e., debt

---

[1] *See* Saad, Lydia, *401(k) Regaining Importance as Future Income Source*, Gallup, available at https://news.gallup.com/poll/209579/401-regaining-importance-future-income-source.aspx (last accessed May 1, 2019).

[2] A "designated investment alternative" is defined as "any investment alternative designated by the plan into which participants…may direct the investment of assets held in, or contributed to, their individual accounts." 29 C.F.R. § 2550.404a-5(h)(4).

securities), and equity or stock investments.[3]

31.     The menu of investment options from which employers choose is ultimately constructed by the employer, though the actual assembly of the menu is often done in consultation with plan service providers.

32.     Unlike traditional defined retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or underperformance, 401(k) plans operate in a manner in which participants bear the risk of poor investment selection choices, whether due to poor performance, high fees, or both.

**B.     401(k) Fees**

33.     There are various fees and expenses associated with the maintenance and management of the investment products in which defined contribution plan assets are invested. These costs can be broken down into two major categories: administrative expenses and investment management expenses.

34.     Investment management expenses are the fees that are charged by the investment manager and are typically assessed based on the investments held by the plan. In other words, participants typically pay these asset-based fees as an expense of the investment options in which they invest. Larger plans can lower investment management fees by selecting mutual funds only available to institutional investors or by negotiating directly with the investment manager to obtain a lower fee than is offered to mutual fund investors.

35.     Investment management fees are also controlled by the fund's management style. Investment funds can be either actively or passively managed. Passive funds, popularly known as

---

[3] Bonds are generally categorized by the issuer/borrower (e.g., U.S. government, foreign government, municipalities, corporation), the duration of the debt (e.g., "short-term," "intermediate term," and "long-term"), and the default risk associated with the borrower (e.g., "high-yield"). Equity investments are generally categorized by geography (i.e., investments in domestic versus international companies), size (e.g., "small cap," "mid cap," or "large cap"), and investment style (e.g., "growth," i.e., fast-growing companies, "value," i.e., more conservative or established stocks, or "blend," i.e., a mix of growth stocks, value stocks, and companies in between). *See* Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 Yale L.J. 1476, 1485 (2015).

"index funds," seek to replicate the performance of a market index, such as the S&P 500, by purchasing a portfolio of securities matching the composition of the index itself, therefore producing returns that are very close to the market segment tracked by the index and offering low expenses. Actively managed funds, on the other hand, pick individual stocks and bonds and try to beat the market through superior investment selection, and are thus typically more expensive.

36.     Administrative expenses are the fees charged for the day-to-day operations necessary for administering the plan as a whole, such as recordkeeping, trustee and custodial services, accounting, etc.

37.     Recordkeeping is a necessary administrative service for any defined contribution plan. The cost of providing recordkeeping services depends on the number of participants in a plan, but has little to do with the amount of money in the participants' accounts: it costs the same to provide recordkeeping to a participant with $1,000 in his or her retirement account as a participant with $100,000.

38.     The total cost of investing in a 401(k) plan is the total of administrative expenses charged at the plan level and the cost of managing the particular funds in the chosen investment menu.

39.     Fiduciaries can minimize plan expenses by hiring low-cost service providers and by selecting a menu of low-cost investment options. The larger a plan gets, the task of minimizing fees become easier: the large account balances of 401(k) plans lead to economies of scale, which generally lower administrative expenses on a per-participant or percentage-of-assets basis.[4]

### C.     Hidden Fees in 401(k) Revenue Sharing Arrangements

40.     The administrative tasks described above are typically outsourced to one or more third-party service providers who may be paid directly by employers, directly by the plan, or

---

[4] *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses* (July 2016), at 10, available at https://www.ici.org/pdf/per22-04.pdf.

indirectly by the plan in a practice known as "revenue sharing."

41.    Revenue sharing involves indirect compensation inasmuch as there is no direct cost charged to the plan participants, but the plan includes funds in its menu that kick back part of their fees to the service provider. In a revenue-sharing arrangement, an employer might negotiate a fee agreement for investing assets in a given fund by agreeing to pay an asset-based fee—*i.e.*, an "expense ratio"—in which the fees are assessed against each dollar invested in the fund, rather than the true cost of the fund's services. The fees paid by the plan then often include both the actual cost of the fund's services and additional amounts that the fund does not need to cover the cost of its services. That additional portion is then "shared" with plan service providers who do business with the plan or the fund. As a result, plan service providers or others who do business with the plan or fund often receive both a direct payment from the plan and additional indirect revenue-sharing payments from the plan, *i.e.*, revenue that the fund acquires and "shares" with them.

42.    The practice of revenue sharing means that the administrative costs for running the plan are ultimately paid out of the investment management fees, as income from fees collected by the advisors of investment funds on the plan menu are passed back to the service provider as compensation for certain services.

43.    The Department of Labor requires plans to identify which of their service providers are being paid via revenue sharing, a practice referred to as "indirect compensation" on the Form 5500. One reason for this required disclosure is that revenue sharing can create a conflict of interest in the construction of the plan menu. Employers select investment options for the plan with the guidance of service providers who, in many cases, receive revenue from funds that are included in the plan (through revenue sharing). The conflict of interest emerges when the service provider stands to receive greater compensation by selecting certain funds.

44.    However, service providers can hide the revenue flowing to them from the mutual funds they select for a given plan by developing so-called "bundled" service sets. The problem

with "bundled" service arrangements is that it is extremely difficult to locate hidden revenue sharing fees and calculate the service provider's total compensation: often the "bundled" service provider (*e.g.*, a recordkeeper) will receive "hard dollars" (*i.e.*, direct payments) for its recordkeeping as well as "soft dollars" (*i.e.*, shared payments from the plans investments), but it will not disclose to plan fiduciaries these "soft dollars" or hidden fee arrangements between itself and the investment fund which holds the assets.

45.    The total fees a fund charges to a plan can vary widely based upon a number of factors, including the amount of plan assets invested in the fund, the plan fiduciary's level of sophistication and diligence in negotiating the fee agreement, the existence of revenue sharing transfers between fund managers and service providers and the plan fiduciary's awareness of and efforts to monitor them, and any separate financial interests held by the plan fiduciary and the fund as they negotiate.

46.    As stated in the DOL's Field Assistance Bulletin 2002-3,[5] a fiduciary is required to "engage in an objective process designed to elicit information necessary to assess the qualifications of the provider, the quality of services offered, and the reasonableness of the fees charged in light of the services provided … such process should be designed to avoid self-dealing, conflicts of interest or improper influence."

47.    This is important guidance because often revenue sharing arrangements are made by service providers to benefit each other and as such a "bundled" recordkeeper provider may have an incentive to push a certain investment manager if they know they are going to receive "soft dollars" or "revenue sharing" unbeknownst to the plan fiduciaries. These deals are often cut between the providers themselves outside of the presence of the plan fiduciaries and are not disclosed to the employees or employer plan sponsor.

48.    Plan fiduciaries are required to probe into those hidden costs and find out if

---

[5] Dep't of Labor, Field Assistance Bulletin 2002-3 (November 5, 2002), available at https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2002-03.

revenue sharing is occurring and if so, what those hard dollars are and what relationships might exist between the parties. It is not permissible or in the best interests of the plan participants if assets are being steered towards an investment manager purely because fees will be kicked back to the recordkeeper.

49.     One way a fiduciary can determine the reasonableness of the plan's total administrative expenses and investment management fees is by comparison to other similarly-sized plans. Publicly available surveys provide important information to help fiduciaries understand the quality of their plan design and structure. For example, the Department of Labor makes available a comprehensive database for the universe of 401(k) plans (the "DOL Form 5500 Research File"), which plan fiduciaries can analyze. The BrightScope Defined Contribution Plan Database contains additional industrywide fee information based on audited filings that supplement the DOL Form 5500 Research File.[6]

## II.     ERISA FIDUCIARY DUTIES

50.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a), requires, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)     for the exclusive purpose of
>        (i) providing benefits to participants and their beneficiaries; and
>        (ii) defraying reasonable expenses of administering the plan; [and]
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

---

[6] *See* BrightScope and Investment Company Institute, The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2015 (March 2018) ("BrightScope/ICI Profile"), available at www.ici.org/pdf/ppr_18_dcplan_profile_401k.pdf. The Form 5500, which all private-sector sponsors of 401(k) plans are required to file annually with the DOL, contains information about the plan including the number of participants, total plan assets, and total contributions to and distributions from the plan. Generally, plans with 100 participants or more are required to file an additional audited report with the DOL. These reports generally contain information on the investments offered by the plan, assets in these investments, and employer contribution structures.

51.     Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in the plan. Thus, "the duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties."[7]

52.     ERISA, 29 U.S.C. §1132(a)(3), provides a cause of action against a fiduciary who breaches a fiduciary duty.

53.     ERISA, 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.

54.     ERISA, 29 U.S.C. §1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through the use of plan assets. ERISA, 29 U.S.C. §1109, further provides that such fiduciaries are subject to other equitable or remedial relief as a court may deem appropriate.

### A.     Duty of Loyalty

55.     A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest of plan participants and beneficiaries. As the Department of Labor has repeatedly warned:

> We have construed the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to, participants and beneficiaries as prohibiting a fiduciary from subordinating the interests of participants and beneficiaries in their retirement income to unrelated objectives. Thus, in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment may not be influenced by [other] factors

---

[7] *In re Unisys Savings Plan Litig*., 74 F.3d 420, 435 (3d Cir. 1996).

unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan.[8]

**B.     Duty of Prudence**

56.     Under 29 U.S.C. § 1104(a)(1)(C), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options.

57.     The Department of Labor has explained:

> To act prudently, a plan fiduciary must consider, among other factors, the availability, riskiness, and potential return of alternative investments for his or her plan. [Where an investment], if implemented, causes the Plan to forego other investment opportunities, such investments would not be prudent if they provided a plan with less return, in comparison to risk, than comparable investments available to the plan, or if they involved a greater risk to the security of plan assets than other investments offering a similar return.[9]

58.     The Department of Labor also counsels that fiduciaries are responsible for ensuring that a plan pays reasonable fees and expenses and that fiduciaries need to carefully evaluate differences in fees and services between prospective service providers:

> While the law does not specify a permissible level of fees, it does require that fees charged to a plan be "reasonable." After careful evaluation during the initial selection, the plan's fees and expenses should be monitored to determine whether they continue to be reasonable. In comparing estimates from prospective service providers, ask which services are covered for the estimated fees and which are not. Some providers offer a number of services for one fee, sometimes referred to as a "bundled" services arrangement. Others charge separately for individual services. Compare all services to be provided with the total cost for each provider. Consider whether the estimate includes services you did not specify or want. Remember, all services have costs. Some service providers may receive additional fees from investment vehicles, such as mutual funds, that may be offered under an employer's plan. For example, mutual funds often charge fees to pay brokers and other salespersons for promoting the fund and providing other services. There also may be sales and other related charges for investments offered by a service provider. Employers should ask prospective providers for a detailed explanation of all fees associated with their investment options.[10]

---

[8] *See, e.g.,* U.S. Dep't of Labor, Advisory Opinion No. 98-04A (May 28, 1998), available at https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/advisory-opinions/1998-04a; U.S. Dep't of Labor, Advisory Opinion No. 88-16A (December 19, 2988).

[9] Id.

[10] U.S. Dep't of Labor, *Meeting Your Fiduciary Responsibilities* (May 2004), available at http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html.

59.     In a separate publication, the Department of Labor has written:

Plan fees and expenses are important considerations for all types of retirement plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided. By far the largest component of plan fees and expenses is associated with managing plan investments. Fees for investment management and other related services generally are assessed as a percentage of assets invested. Employers should pay attention to these fees. They are paid in the form of an indirect charge against the participant's account or the plan because they are deducted directly from investment returns. Net total return is the return after these fees have been deducted. For this reason, these fees, which are not specifically identified on statements of investments, may not be immediately apparent to employers.[11]

60.     The Restatement instructs that "cost-conscious management is fundamental to prudence in the investment function," and should be applied "not only in making investments but also in monitoring and reviewing investments."[12]

61.     In this vein, the Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."[13]

62.     The Supreme Court has held that the duty of prudence includes an ongoing duty to monitor a plan's investment options.[14] In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act, which recognizes that "the duty of prudent investing

---

[11] U.S. Dep't of Labor, *Understanding Retirement Plan Fees and Expenses* (May 2004), available at http://www.dol.gov/ebsa/publications/undrstndgrtrmnt.html.

[12] Restatement (Third) of Trust § 90, cmt. b.

[13] U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at http://www.dol.gov/ebsa/publications/401k_employee.html.

[14] *Tibble v. Edison, Int'l*, 135 S. Ct. 1823 (2015)

applies both to investing and managing trust assets…"[15] As the official comment further explains, "'managing' embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments."[16]

### III.   THE LINEAR TECHNOLOGY 401(K) PLAN

63.   The Plan covers eligible employees of Linear Technology.

64.   The Plan's most recent Form 5500, filed with the U.S. Department of Labor, states that at the end of the 2017 plan year, the Plan had approximately $616 million in assets and 2,369 participants with account balances.

65.   Between May 10, 2013 and May 10, 2019 (the "Class Period"), the Plan has offered 30-35 different core investment options for which data is available, including primarily mutual funds (equity, bond, balanced, money market, index etc.) and at least one stable value fund. In 2013, the Plan's "core" investment options included 16 equity funds, nine balanced (target-date) funds, two bond funds, two index funds, one money market fund, and one stable value fund.

66.   By the end of 2017, the Plan had added four additional equity funds and four additional bond funds and had removed four equity funds, two balanced (target-date) funds, and one index fund.

67.   At all relevant times during the Class Period, Transamerica served as the Plan's recordkeeper.

68.   Taking into account all administrative and investment expenses within the Plan, and using the 2017 year-end balance (as reported in the Plan's Form 5500 for 2017) and publicly available information regarding each investment's expenses, Plaintiff estimates that the total plan costs for 2017 were over $50 million, equal to an average fund expense of 0.82% of the $616

---

[15] *Id.* at 1828 (quoting Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994))

[16] Uniform Prudent Investor Act § 2 comment.

million in plan assets.

69.     The Plan's average fund cost of 0.82% is extremely high for a defined-contribution plan with over $600 million in assets. In 2015, the average asset-weighted plan cost for plans with between $500 million and $1 billion in assets was 0.41%.[17] Ninety percent of plans with between $500 million and $1 billion in assets had total plan costs of less than 0.59%.[18] Therefore, in 2015, the Plan was twice as expensive as the average plan of a similar size and more expensive than over 463 of the 515 defined contribution plans with between $500 million and $1 billion in assets.[19]

70.     The expense ratios for the Plan's core investment options also lag significantly behind industry averages. In 2015, the asset-weighted average expense ratios of equity, balanced, and bond mutual funds were 0.49%, 0.51%, and 0.36% respectively.[20] The expense ratios for the same types of funds within the Plan are significantly higher. In 2015, the equity mutual funds had expense ratios between 0.59% and 1.31%. The balanced mutual funds in the Plan had expense ratios between 0.61% and 0.95%.  The bond mutual funds in the Plan had expense ratios between 0.65% and 0.74%, with one exception that was added in 2015.[21] In short, at least 28 of the 31 core investment options for which data was available had above-average expenses (and many of those funds had expenses that were nearly double the category average).

71.     The Plan's total expenses also included a disproportionate amount of administrative fees. On average, 82% of total fees within a plan are investment management

---

[17] *See* BrightScope/ICI Profile, *supra* note 9 at 53.

[18] *Id.* at 54.

[19] *Id.* at 13.

[20] *Id.* at 56.

[21] In 2015, the Plan added the Vanguard Short Term Investment Grade Administrative Fund, with an expense ratio of 0.10%. It was the only bond fund in the Plan's lineup with an expense ratio below 0.65%.

expenses, while administrative fees make up on 18% of the total fees.[22] In 2017, 26.3% of the Plan's total direct compensation costs were investment management expenses, while administrative fees (specifically, recordkeeping) made up 73.37% of the Plan's total direct compensation costs.

## IV.   DEFENDANTS' BREACHES OF FIDUCIARY DUTY

72.     Defendants' process for selecting, managing, and monitoring the Plan was neither prudent nor loyal. At all stages—including in selecting the Plan's investment options and in monitoring the cost and performance of these investments—Defendants failed to perform a standardized, routine, critical review of the Plan's investment options by impartial, unbiased fiduciaries, and/or Defendants were incentivized not to undertake such a review because they and/or affiliated companies were profiting from the higher fees.

73.     As indicated below, because Defendants stacked the Plan with high-cost funds in order to provide revenue-sharing, failed to investigate lower-cost alternatives, and failed to remove high-cost, underperforming funds, the Plan's expenses are significantly higher than other comparable retirement plans.

### A.     Defendants Stacked the Plan With High-Cost Funds At The Expense Of Plan Participants

74.     Defendants selected and retained certain investment options based upon revenue sharing relationships, thus foregoing lower-cost, better performing investment alternatives. These alternatives included identical share classes of the same mutual funds that charged lower fees because they paid less revenue sharing, institutional products by the same fund managers which offer materially identical investments for even lower cost, or alternative institutional products offered by different managers who are either unwilling to pay or pay less revenue sharing to the Plan's service providers.

---

[22] Investment Company Institute & Deloitte Consulting LLP, *Inside the Structure of Defined Contribution/401(k) Plan Fees, 2013*, at 17 (Aug. 2014), available at http://www.ici.org/pdf/rpt_14_dc_401k_fee_study.pdf.

75.     The Plan's offerings were selected and retained to maximize and conceal the true amount of compensation paid to service providers and/or to reduce the cost of the Plan to Linear Technology, all at the expense of the Plan's participants. At all relevant times, most of the Plan's fund lineup (i.e., at least 80% of the funds included in the Plan's offerings) provided revenue sharing payments from the investment companies whose products Defendants selected to be on the Plan's platform. Those investment companies gave service providers a certain percentage of the income they received from Plan assets invested in their company's fund.

76.     Defendants failed to select lower-cost options and failed to remove certain high-cost funds in favor of lower-cost options because it would have reduced the revenue sharing opportunities. At all stages, Defendants prioritized opportunities for revenue sharing, in furtherance of their own financial interests (and/or the financial interests of service providers) rather than the interests of Plan participants.

77.     Specifically, Defendants breached their fiduciary duties to the Plan when they failed to procure the lowest-cost share class of numerous mutual funds in the Plan. Defendants also breached their fiduciary duties when they failed to monitor the performance of expensive funds and remove or replace them with cheaper funds that offered substantially identical investment products with a history of better performance.

**1.     Defendants failed to procure the least expensive available share class of numerous funds.**

78.     For at least 11 mutual funds offered in the Plan, Defendants selected and retained higher-cost share classes when lower-cost *identical* mutual funds were available to the Plan.

79.     Many of the funds selected and retained by Defendants hold so-called "retail class" shares, which are generally intended for individual investors. Larger retirement plans have the ability to obtain cheaper share classes—i.e., "institutional class" shares—that offer the same or better performance. The less expensive institutional share classes should have been available investment options for the Plan given the Plan's size.

80.     Despite the availability of less expensive institutional share classes, Defendants selected and retained more expensive retail share classes based upon the revenue sharing opportunities available with the higher-cost share classes.

81.     The expenses for these funds are significantly higher than the expenses for the lower share class of identical mutual funds. Indeed, as shown by the chart below, the Plan paid fees between 25% and 116% higher than it should have paid for the *identical* mutual fund product:

| Plan Mutual Fund | Plan Assets[23] | Fund Expense Ratio | Identical Lower-Cost Fund | Identical Lower-Cost Fund Fee | Annual Plan Savings Available |
|---|---|---|---|---|---|
| JPMorgan Small Cap Equity Fund Class A | $58,607,852 | 1.24% | JPMorgan Small Cap Equity Fund Class R5 | 0.80% | $111,335 |
| JPMorgan U.S. Equity Fund Class A | $28,723,076 | 0.94% | JPMorgan U.S. Equity Fund Class R6 | 0.44% | $71,808 |
| Virtus Ceredex Large-Cap Value Equity Fund Class I | $22,670,953 | 0.97% | Virtus Ceredex Large-Cap Value Equity Fund Class R6 | 0.72% | $56,677 |
| MainStay Large Cap Growth Fund Class R1 | $18,335,003 | 0.85% | MainStay Large Cap Growth Fund Class R6 | 0.63% | $40,337 |
| American Funds EuroPacific Growth Fund Class R-4 | $16,254,751 | 0.83% | American Funds EuroPacific Growth Fund® Class R-6 | 0.49% | $14,629 |
| AMG Managers Fairpointe Mid Cap Fund Class N | $15,528,364 | 1.14% | AMG Managers Fairpointe Mid Cap Fund Class I | 0.89% | $38,820 |
| Goldman Sachs Mid Cap Value Fund Class A | $12,229,397 | 1.16% | Goldman Sachs Mid Cap Value Fund Class R6 | 0.76% | $18,433 |
| MFS Massachusetts Investors Growth Stock Fund Class R3 | $11,874,543 | 0.74% | MFS Massachusetts Investors Growth Stock Fund Class R6 | 0.39% | $11,875 |
| American Funds Fundamental Investors Class R-4 | $10,196,549 | 0.65% | American Funds Fundamental Investors® Class R-6 | 0.30% | $10,197 |

---

[23] Plan assets are identified based on the Plan's 2017 Form 5500 filing with the U.S. Department of Labor.

| Baron Small Cap Fund Retail Class | $2,842,482 | 1.31% | Baron Small Cap Fund Institutional Class | 1.05% | $284 |
| Victory Munder Mid-Cap Core Growth Fund Class A | $2,409,859 | 1.28% | Victory Munder Mid-Cap Core Growth Fund Class R6 | 0.84% | $4,579 |

82.     There is no material difference between the share classes selected and retained in the Plan and the alternative share classes listed above, aside from costs. The lower-cost share classes were available during the Class Period and would have provided an identical version of the same investment, including the same fund manager and an identical mix of investments within each fund.

83.     Given the Plan's size, Defendants had sufficient bargaining power to obtain the lowest-cost share class available at any given time for the Plan's investment lineup. Defendants also had access to the most up-to-date information about the lowest-share classes available for the Plan's investment lineup. Nevertheless, Defendants failed to promptly select lower-cost share classes which were identical in all respects (portfolio manager, underlying investments, structure, and asset allocation) except for cost.

84.     Defendants' failure to timely move Plan assets from the higher-cost share classes was beneficial to the funds' investment managers, which collected the excess fees paid by the Plan. The Plan's selection and retention of these higher-cost share classes was also beneficial to the Plan's service providers, which received more revenue from the revenue sharing arrangements associated with the selection of the higher-cost share classes than they would have received if Defendants selected the lower-cost share classes.

85.     The Plan failed to move to cheaper share classes as they became available either because Defendants wanted to maximize and conceal the amount of compensation paid to service providers at the expense of the Plan's participants (and removing the higher-cost share classes would have reduced the revenue sharing opportunities), or Defendants failed to consider the size and purchasing power of the Plan when selecting share classes, thereby failing to engage

in a prudent process for the selection, monitoring, and retention of those mutual funds. Had the amounts invested in the higher-cost share classes instead been invested in the lower-cost share class mutual options listed above from May 10, 2013 to the present, the Plan would have retained over $1,947,736 more in retirement savings, which would have grown even larger because it would have remained invested in the Plan.[24]

### 2. Defendants failed to remove high-cost funds that were underperforming compared to their peers despite the availability of comparable funds with lower costs and better prospects for future performance.

86.    In addition, Defendants retained expensive—and in many cases, underperforming—funds when lower-cost, substantially similar alternatives were available.

87.    To start, of the 32 investment options offered by the Plan in 2017, at least fourteen of them had less expensive alternatives that offered substantially similar, if not identical investment products. All fourteen funds paid some form of revenue sharing benefit to Transamerica. Defendants' failure to replace these funds with less expensive alternatives available throughout the Class Period has cost the Plan over $6,528,624.[25]

88.    The performance of the high-cost investment options retained in the Plan also frequently fell short of cheaper alternatives. For example, at least twelve of those funds underperformed their peers for both one- and three-year return periods, and at least four also underperformed their peers for the five-year period[26]:

---

[24] Assuming an average annual return of 7% over the Class Period, a more realistic estimate of the Plan's losses due to Defendants' failure to select available lower-fee share classes is $2,740,159.

[25] Assuming an average annual return of 7% over the Class Period, a more realistic estimate of the Plan's losses due to Defendants' failure to utilize less expensive alternatives is $9,177,433.

[26] An investment has "underperformed" for the given return period if the investment does not place in the top 50% of its peer group.

| Plan Mutual Fund | Total Return % (% rank in peer group) | | |
| --- | --- | --- | --- |
| | 1-Year | 3-Year | 5-Year |
| AMG Managers Fairpointe Mid Cap Fund Class N | -18.58 (87) | 4.05 (68) | 2.07 (86) |
| Victory Munder Mid-Cap Core Growth Fund Class A | -13.85 (92) | 4.63 (88) | 3.73(88) |
| Oakmark Global Fund Investor Class | -18.97 (97) | 2.53 (91) | 1.34 (88) |
| Virtus Ceredex Large-Cap Value Equity Fund Class I | -10.39(72) | 6.34 (56) | 4.96 (59) |
| JPMorgan US Equity A | -6.39 (55) | 7.84 (53) | 7.40 (40) |
| JP Morgan Smart Retirement 2020 Institutional Fund | -5.35 (76) | 4.52 (51) | 3.91 (26) |
| JP Morgan Smart Retirement 2025 Institutional Fund | -6.58 (87) | 4.86 (63) | 4.18 (26) |
| JP Morgan Smart Retirement 2030 Institutional Fund | -7.54 (85) | 5.27 (58) | 4.40 (29) |
| JP Morgan Smart Retirement 2035 Institutional Fund | -8.76 (94) | 5.37 (74) | 4.43 (38) |
| JP Morgan Smart Retirement 2040 Institutional Fund | -9.47 (92) | 5.61 (63) | 4.56 (38) |
| JP Morgan Smart Retirement 2045 Institutional Fund | -9.72 (90) | 5.56 (75) | 4.54 (43) |
| JP Morgan Smart Retirement 2050 Institutional Fund | -9.77 (84) | 5.54 (74) | 4.53 (43) |

89.    Indeed, many of these funds both had historical underperformance *and* were significantly more expensive compared to alternatives that offered substantially similar (if not identical) investment products. The following chart identifies examples of such funds that were retained in the Plan, where many had *several* cheaper, better performing alternatives available:

| Plan Mutual Fund | Fund Expense Ratio | Average Annual Return | Alt. Fund | Alt. Fee | Alt. Avg. An. Return |
| --- | --- | --- | --- | --- | --- |
| AMG Managers Fairpointe Mid Cap Fund Class N | 1.14% | -18.58% (1Y) 4.05% (3Y) 2.07% (5Y) | AMG Managers Fairpointe Mid Cap Fund Class I | 0.89% | -18.37% (1Y) 4.31% (3Y) 2.33% (5Y) |
| Victory Munder Mid-Cap Core Growth Fund Class A | 1.28% | -13.85% (1Y) 4.63% (3Y) 3.73% (5Y) | Victory Munder Mid-Cap Core Growth Fund Class R6 | 0.84% | -13.47% (1Y) 5.10% (3Y) 4.19% (5Y) |
| Virtus Ceredex Large-Cap Value Equity Fund Class I | 0.97% | -10.39% (1Y) 6.34% (3Y) 4.96% (5Y) | Manning & Napier Disciplined Value Series Class I | 0.57% | -4.07% (1Y) 10.90% (3Y) 8.29% (5Y) |

| Oakmark Global Fund Investor Class | 1.15% | -18.97% (1Y) 2.53% (3Y) 1.34% (5Y) | Boston Partners Global Equity Institutional Class | 0.95% | -13.15% (1Y) 4.29% (3Y) 3.59% (5Y) |
|---|---|---|---|---|---|
| | | | Hotchkis & Wiley Global Value Fund Class I | 0.95% | -16.03% (1Y) 4.51% (3Y) 1.94% (5Y) |
| JPMorgan U.S. Equity Fund Class A | 0.94% | -6.39 (1Y) 7.84 (3Y) 7.40 (5Y) | JPMorgan U.S. Research Enhanced Equity Fund Class R6 | 0.25% | -5.50% (1Y) 8.08% (3Y) 7.43% (5Y) |
| | | | T. Rowe Price Total Equity Market Index Fund | 0.30% | -5.59% (1Y) 8.72% (3Y) 7.68% (5Y) |
| | | | Schroder North American Equity Fund Class Investor | 0.33% | -4.94% (1Y) 8.87% (3Y) 7.64% (5Y) |
| | | | JPMorgan U.S. Equity Fund Class R6 | 0.44% | -5.86% (1Y) 8.31% (3Y) 7.89% (5Y) |
| | | | JPMorgan Tax Aware Equity Fund Class I | 0.55% | -4.93% (1Y) 8.89% (3Y) 8.47% (5Y) |

90.     Defendants retained these funds, despite their high fees and poor performance histories, either in order to provide revenue sharing to Transamerica and other service providers or because they failed to monitor the cost and performance of the funds compared to substantially similar alternative investment products available on the market.

91.     A prudent fiduciary ensures that the performance of expensive investment options justifies the increased expense of the funds. Defendants knew or should have known that these investment options were imprudent investments for the Plan because these funds were both more expensive than and underperformed comparable funds that were available in the marketplace.

92.     All of this information was known and/or available to Defendants each and every year during the Class Period when they maintained these costly and unreasonable investment options in the Plan. However, not a single one of these funds was removed as a Plan investment option, despite the availability of a lower-cost, better performing alternative. Instead, Defendants

1   selected (and retained) high cost options that caused the Plan to squander vast sums on

2   unnecessary fees.

3        93.     These funds could not have been selected and retained as a result of a prudent

4   decision-making process. A couple examples highlight Defendants' imprudent process for

5   monitoring and removing poorly performing investments:

6        94.     **Victory Munder Mid Cap Core Growth Fund A (MGOAX)**: In 2012, the Plan

7   had approximately $1,064,453.00 invested in the Victory Munder Mid Cap Core Growth Fund A

8   (MGOAX). By 2018, this fund had underperformed its peers for the one-year, three-year, and

9   five-year return periods and had a net expense ratio of 1.28%, that is, nearly three times more

10   expensive than the average domestic equity fund of a similarly-sized plan.[27] Based on this record

11   of poor performance, it would have been prudent for Defendants to remove the fund from the

12   Plan, at the very least in 2015, when the fund was outperformed by 88% of its peers for the

13   second return period in a row. Yet Defendants retained the fund in the Plan. In 2017, the fund

14   was outperformed by 92% of its peers, trailing the median by over 800 basis points.[28]

15        95.     **Virtus Ceredex Large-Cap Value Equity Fund Class (STVTX):** In 2012, the

16   Plan had approximately $13,775,697.00 invested in the Virtus Ceredex Large-Cap Value Equity

17   Fund Class (STVTX) (formerly the Ridgeworth Large-Cap Value Equity I Fund). By 2018, this

18   fund had underperformed its peers for the one-year, three-year, and five-year return periods and

19   had a net expense ratio of 0.97%, that is, twice as expensive as the average domestic equity fund

20   of a similarly-sized plan. Based on this record of poor performance, it would have been prudent

21   for Defendants to remove the fund from the Plan, at the very least in 2015, when the fund was

22   outperformed by 56% of its peers, after being outperformed by 59% of its peers in the previous

23

24   [27] The average expense ratio for a domestic equity mutual fund in a plan with $500 million to $1 billion in assets in 2015 was 0.45%. *See* BrightScope/ICI Profile, *supra* note 9 at 57. The above comparison actually understates the excessiveness of the fund's fees as of 2018 because it is based on the average expense ratio for 2015, and the average expense ratios for mutual funds have continued to decline from 2015 to 2017. *Id.*

25

26

27   [28] In other words, the fund's losses were 8% over the median losses of its peer group.

28

return period. At the time, better performing alternatives offering substantially similar investment products were available, such as the Manning & Napier Disciplined Value Series Class I (which also has a lower expense ratio of 0.57%). Yet Defendants retained the fund in the Plan. In 2017, the fund was outperformed by 72% of its peers.

96.     Had Defendants selected and monitored the Plan's portfolio of investments in a prudent manner and as part of a process that was not tainted by self-interest, they would either not have selected these funds for inclusion in the Plan or would have removed them as part of a regular review of the Plan's portfolio.

## B.     Defendants Failed To Adequately Monitor The Plan's Total Recordkeeping Fees

97.     Because Defendants stacked the Plan with funds that provided revenue sharing opportunities, the Plan's expenses are significantly higher than other comparable retirement plans.

98.     Transamerica received payments for its recordkeeping and other administrative services by direct disbursement from the Plan assets (i.e., "hard dollar" payments or "direct compensation") and revenue sharing payments comprised of Plan assets (i.e. "soft dollar" payments or "indirect compensation").

99.     Defendants failed to review the total recordkeeping and administrative services expenses paid by the Plan's assets through both direct and indirect compensation, conduct a reasonable investigation into the marketplace for fees, and/or act upon this information to monitor and control the Plan's total costs. Defendants' failure to adequately monitor the Plan's fees has allowed Transamerica to reap gross and unreasonable profits at the expense of Plan participants.

### 1.     The Plan Made Excessive "Hard Dollar" Payments To Transamerica.

100.     "Hard dollar" payments to service providers are generally disclosed to the public and participants, in one form or another. According to forms filed by the Plan with the

Department of Labor, Transamerica received the following "hard dollar" payments from the Plan:

| Year | Hard Dollar Payments | Plan Participants | Direct Compensation Per Participant |
|------|---------------------|-------------------|-------------------------------------|
| 2013 | $19,005.00 | 2,202 | $8.63 |
| 2014 | $16,675.00 | 2,271 | $7.34 |
| 2015 | $167,126.00 | 2,316 | $72.16 |
| 2016 | $363,794.00 | 2,332 | $156.00 |
| 2017 | $542,867.00 | 2,369 | $229.15 |

101.   This substantial increase in hard dollar payments by the Plan to Transamerica—over **two-thousand percent** over a four-year period—is a material change in circumstances for the Plan and constitutes an excessive payment by the Plan for the services rendered by Transamerica. Defendants failed to assess the reasonableness of these fees and the material increase in fees paid directly by the Plan for recordkeeping services during this period.

102.   Recordkeeping fees for the Plan's peer groups average approximately $110,000.

103.   In 2012, the Plan's recordkeeper was Diversified Retirement Corporation, which the Plan compensated $19,210.00 in hard dollar payments for that year. In 2013, the Plan replaced Diversified Retirement Corporation with Transamerica, which the Plan compensated nearly an identical amount in hard dollar payments for ostensibly identical recordkeeping services. While the number of participants increased by less than 8% from 2012 to 2017, the amount of hard dollar payments paid to Transamerica for recordkeeping services increased 2756% over that period. The services offered by Transamerica did not materially change from 2013 to 2017. At the very least, the need to renegotiate the hard dollar payments to Transamerica should have been apparent in 2015, when the hard dollar payments increased by 900% despite a 2% increase in the number of participants.

104.    Defendants failed to monitor and assess the reasonableness of the hard dollar payments Transamerica received from the Plan's assets. Prudent fiduciaries monitor the plan's total costs to determine the reasonableness of the fees paid for recordkeeping and administrative services. Moreover, prudent fiduciaries regularly solicit competitive bids from prospective service providers, including recordkeepers, in order to assess the reasonableness of the fees.

105.    Defendants caused the Plan to purchase recordkeeping services from Transamerica without any competitive bidding process and without any meaningful negotiation over the compensation to be paid for the Plan's recordkeeping services, even though other entities could have provided the same services at a lower cost to the Plan. Defendants failed to request these bids from competitors of Transamerica and/or failed to evaluate the total hard dollar payments made to Transamerica to ensure that they were reasonable in light of the bids from competing service providers.

### 2.    The Plan Made Excessive Revenue Sharing Payments to Transamerica.

106.    At all relevant times, Transamerica was also indirectly compensated for its recordkeeping services in the form of revenue sharing arrangements between Transamerica and the investment companies whose products were retained in the Plan's lineup. When Plan assets were invested in funds with revenue sharing arrangements, a set number of basis points (i.e., a percentage of the Plan assets in the fund) was transferred from the fund's investment managers to Transamerica, ostensibly to pay for Transamerica's recordkeeping services. Transamerica's fee thus grew as the assets of the Plan grew, even if Transamerica provided no additional services to the Plan.

107.    The Department of Labor requires plans to identify which of their service providers are being paid via indirect compensation on the Form 5500. At least twenty-six of the mutual funds included in the Plan shared a portion of the fund's annual fees with Transamerica:

| Fund | Revenue Sharing Amount[29] | Plan Assets (2015) | Compensation to Transamerica |
|---|---|---|---|
| American Funds EuroPacific Growth Fund Class R-4 | 34.146 | $16,560,593.00 | $56,547.80 |
| American Funds Fundamental Investors Class R-4 | 34.146 | $9,094,578.00 | $31,054.35 |
| Aston/Optimum Mid Cap N Fund | 39.024 | $13,329,374.00 | $52,016.55 |
| Baron Small Cap Fund Retail Class | 39.024 | $2,729,177.00 | $10,650.34 |
| Franklin Small Cap Value Fund Class R6 | 24.00 | $4,217,907.00 | $10,122.98 |
| Goldman Sachs Mid Cap Value Fund Class A | 53.658 | $11,517,068.00 | $61,798.28 |
| JP Morgan Small Cap Equity Fund Class A | 48.780 | $48,731,320.00 | $237,711.38 |
| JP Morgan Smart Retirement 2015 Institutional Fund | 9.756 | $3,347,331.00 | $3,265.66 |
| JP Morgan Smart Retirement 2020 Institutional Fund | 9.756 | $7,160,830.00 | $6,986.11 |
| JP Morgan Smart Retirement 2025 Institutional Fund | 9.756 | $9,660,483.00 | $9,424.77 |
| JP Morgan Smart Retirement 2030 Institutional Fund | 9.756 | $7,144,512.00 | $6,970.19 |
| JP Morgan Smart Retirement 2035 Institutional Fund | 9.756 | $4,268,810.00 | $4,164.65 |
| JP Morgan Smart Retirement 2040 Institutional Fund | 9.756 | $2,007,411.00 | $1,958.43 |
| JP Morgan Smart Retirement 2045 Institutional Fund | 9.756 | $1,127,538.00 | $1,100.03 |
| JP Morgan Smart Retirement 2050 Institutional Fund | 9.756 | $1,077,497.00 | $1,051.21 |
| JP Morgan Smart Retirement Income Institutional Fund | 9.756 | $3,576,335.00 | $3,489.07 |
| JPMorgan U.S. Equity Fund Class A | 48.780 | $29,883,605.00 | $145,772.23 |
| MainStay Large Cap Growth Fund Class R1 | 34.146 | $20,086,897.00 | $68,588.72 |

[29] Revenue amounts are shown in annualized basis points of plan assets invested in applicable fund, based on Form 5500 for 2015.

| Fund | Revenue Sharing Amount[29] | Plan Assets (2015) | Compensation to Transamerica |
|---|---|---|---|
| MFS Massachusetts Investors Growth Stock Fund Class R3 | 48.780 | $11,966,570.00 | $58,372.93 |
| Victory Munder Mid-Cap Core Growth Fund Class A | 48.780[30] | $2,367,024.00 | $11,546.34 |
| Oakmark Equity & Income Fund Investor Class | 39.024 | $15,637,187.00 | $61,022.56 |
| Oakmark Global Fund Investor Class | 39.024 | $6,197,670.00 | $24,185.79 |
| PIMCO Income Institutional Fund | 2.927 | $3,053,544.00 | $893.77 |
| Virtex Ceredex Large-Cap Value Fund Class 1 (formerly Ridgeworth Large Cap Value Equity I Fund) | 48.780 | $19,355,759.00 | $94,417.39 |
| T. Rowe Price Equity Income Advantage Fund | 39.024 | $24,189,093.00 | $94,395.52 |

108.    Through these revenue sharing arrangements, Transamerica received additional revenue from the Plan assets on top of the hard dollar payments from the Plan, listed above.

109.    Adding revenue sharing from non-proprietary mutual funds to the hard dollar payments discussed above, the compensation that Transamerica received in 2015 alone was well over $1 million.

110.    A normal range of recordkeeping fees for the Plan would have been, in aggregate, between approximately $50 and $75 per participant in 2015. Based on the hard dollar payments made from the Plan to Transamerica, the Plan's recordkeeping expenses *appeared* to fall within this range in 2015. However, the recordkeeping fees actually paid by the Plan greatly exceeded the normal range. For 2015—and upon information and belief, the majority of the Class Period— Transamerica received additional indirect compensation in excess of $456 per participant per year in revenue sharing from the Plan's investments. These payments were over six times the

---

[30] According to the Plan's Form 5500, starting October 1, 2015 (and through the year end), the Plan actually increased the revenue-sharing amount paid to Transamerica from the Victory Munder Mid-Cap Core Growth Fund to 58.536 basis points; therefore, this figure understates the total revenue-sharing amounts paid from Plan assets to Transamerica in 2015.

amount a prudent fiduciary would have paid.

111.    Given the nature of asset-based indirect compensation, it is typical that the revenue sharing amount paid to the recordkeeper will increase as the plan grows larger, even though the actual cost of the recordkeeping services provided does not increase. In this vein, prudent fiduciaries monitor the amount of the revenue sharing arrangements to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels. Moreover, prudent fiduciaries identify and agree upon a reasonable level of recordkeeping payments (i.e., an amount that does not grossly overcompensate the recordkeeper for the services performed) and negotiate a recordkeeping contract so that all revenue sharing payments in excess of that agreed-upon amount are returned to the plan and its participants. This is generally accomplished through the creation of a revenue sharing account, also commonly referred to as a plan expense account or a plan expense reimbursement account.

112.    Additionally, as discussed above, prudent fiduciaries submit requests for proposal to potential recordkeeping service providers to obtain cost information regarding what other recordkeepers would charge the plan for a particular set of recordkeeping services (every few years at minimum, and more frequently if the plan's recordkeeping expenses appear to be excessive, for example, if they suddenly increase without explanation). This process allows prudent fiduciaries to determine if their recordkeeping arrangement is competitive, and if it is not, to make appropriate changes.

113.    From 2012 to 2017, the Plan's assets nearly doubled in size. The asset-based revenue sharing arrangements to Transamerica remained substantially the same.[31] As a result, the amount of indirect compensation paid to Transamerica in 2017 nearly doubled the amount paid to it in 2012, even though the number of participants only increased by 8%.

114.    Defendants did not monitor the revenue sharing amounts paid to Transamerica.

---

[31] Revenue sharing amounts were not disclosed in the Plan's Form 5500 for 2016 and 2017, but there were likely minimal changes in revenue sharing for those years because there were minimal changes to the funds/share classes in the Plan's investment lineup.

Had Defendants acted prudently, they would have calculated how many dollars would be or had been generated by the revenue sharing for Transamerica. This would have allowed Defendants to analyze whether revenue sharing was benefitting the Plan and would have put Defendants in a position to negotiate better direct payments for recordkeeping costs or to negotiate better revenue sharing arrangements by leveraging the Plan's size.  Defendants failed to conduct a deliberative process for identifying revenue sharing arrangements and failed to determine whether they remained in the Plan's and participants' best interest. As a result, the compensation Transamerica received for its recordkeeping and administration of the Plan was excessive and unreasonable, especially in light of the Plan's enormous size and asset value.

## CLASS ALLEGATIONS

115.   29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to recover for the Plan the remedies provided by 29 U.S.C. § 1109(a).

116.   **Class Definition**: Plaintiff seeks certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23 on behalf of himself and a class of all others similarly situated, defined as follows:

> All participants and beneficiaries of the Linear Technology 401(k) Plan from May 10, 2013 through the date of judgment.

Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

117.    **Ascertainability and Numerosity**: The Plan has had approximately 2,369 participants during the applicable period and while the exact number of Class members is unknown to Plaintiff at this time, on information and belief, there are thousands of persons in the Class, making joinder of each individual member impracticable. Additionally, the Class is ascertainable because its members will be easily identified through Defendant's records.

118.    **Commonality and Predominance**: Questions of law and fact common to the claims of Plaintiff and the other members of the Class predominate over any questions that may affect individual members of the Class because Defendants owed fiduciary duties to the Plan and all participants and beneficiaries, and they acted as alleged herein as to the Plan and not to any individual participant. Common questions for the Class include but are not limited to the following:

      (a)    whether Defendants are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

      (b)    whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by engaging in the conduct alleged herein;

      (c)    whether Defendants caused the Plan to engage in prohibited transactions in violation of 29 U.S.C. § 1104;

      (d)    whether Plan assets unlawfully inured to Linear Technology in violation of 29 U.S.C. § 1103(c)(1); and

      (e)    how to measure the losses to the Plan resulting from each breach of fiduciary duty.

119.    **Typicality**: Plaintiff's claims are typical of the claims of all the other members of the Class. Defendants treated Plaintiff consistently with other Class members with regard to the Plan, and Plaintiff and the Class members sustained substantially similar damages as a result of Defendant's uniform wrongful conduct. Defendants managed the Plan as a single entity, and therefore Defendants' imprudent decisions affected all Plan participants similarly.

120.     **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and its counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and have the financial resources to do so. Neither Plaintiff nor its counsel have any interest adverse to those of the other members of the Class.

121.     **Superiority**: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendant's misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions ensured.

**COUNT I**
**Breach of Duties of Loyalty and Prudence**
**Excessive Investment Options**
**29 U.S.C. ¶ 1104(a)(1)(A)-(B)**

122.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

123.     Each of the Defendants is a fiduciary of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

124.     29 U.S.C. § 1104 imposes upon Defendants the fiduciary duties of prudence and

1  loyalty in their administration of the Plan and in their selection and monitoring of Plan

2  investments.

3      125.    The scope of the fiduciary duties and responsibilities of Defendants includes

4  managing the assets of the Plan for the sole and exclusive benefit of Plan participants and

5  beneficiaries, defraying reasonable expenses of administering the plan, and acting with the care,

6  skill, diligence, and prudence required by ERISA. Defendants are directly responsible for

7  ensuring that the Plan's fees are reasonable, selecting prudent investment options, evaluating and

8  monitoring the Plan's investments on an ongoing basis, eliminating imprudent investments, and

9  taking all necessary steps to ensure that the Plan's assets were invested prudently.

10     126.    This duty includes a continuing duty to monitor investments and remove

11  imprudent ones.

12     127.    As set forth above, Defendants' process of evaluating the reasonableness of

13  investment options was and is imprudent. Defendants caused the Plan to invest millions of

14  dollars in imprudent investment options, many of which were more expensive and had poor

15  performance histories relative to other investment options that were available to the Plan at all

16  pertinent times.

17     128.    Defendants breached their fiduciary duties by selecting and retaining the higher

18  fee share class investment options in the Plan when far lower cost funds with identical managers,

19  investment styles, and stocks were available.

20     129.    Defendants also breached their fiduciary duties retaining expensive funds with

21  poor performance histories and failing to investigate lower cost, better performing investment

22  alternatives. Such an investigation would have revealed to a reasonable prudent fiduciary that

23  certain investments were imprudent, were selected and retained for reasons other than the best

24  interest of the Plan, and were causing the Plan to waste millions of dollars of participants'

25  retirement savings in excessive and unreasonable fees.

26     130.    By the conduct and omissions described above, and because of the benefits to

27

28

Transamerica at the expense of the Plan, Defendants failed to make Plan investment decisions based solely on the merits of the investment funds and what was in the interest of the participants and beneficiaries of the Plan, that is, for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan, in violation of 29 U.S.C. § 1104(a)(1)(A).

131.   Defendants failed to implement a prudent process to monitor the investments within the Plan and remove those investments that had become imprudent. Defendants selected and retained high-cost, underperforming mutual funds when, at all relevant times, much less expensive options of similar or superior quality were available to the Plan. Defendants also neglected to remove poorly-performing funds from the Plan and failed to consider better-performing alternatives that were available to the Plan. In doing so, Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. §1104(a)(1)(B).

132.   As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants have paid, directly and indirectly, substantial excess fees and have suffered lost opportunity costs which continue to accrue.

133.   Each Defendant is personally liable, and Defendants are jointly and severally liable under 29 U.S.C. §§ 1109(a), 1132(a)(2), and a(3) to make good to the Plan the losses resulting from the breaches alleged herein, to restore to the Plan any profits Defendants made through the use of Plan assets, to restore to the Plan any profits resulting from the fiduciary breaches alleged herein,, and to provide other equitable relief as appropriate.

134.   Each Defendant knowing participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other

Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**COUNT II**
**Breach of Duties of Loyalty and Prudence**
**Excessive Recordkeeping Fees**
**29 U.S.C. ¶ 1104(a)(1)(A)-(B)**

135. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

136. Defendants are responsible for selecting, monitoring, negotiating with and removing the Plan's service providers. This duty includes a continuing duty to regularly assess the amounts of asset-based revenue sharing payments paid to service providers to determine the reasonableness of these fees.

137. In or around 2013, Defendants selected Transamerica as a plan service provider to perform certain administrative services such as recordkeeping services.

138. Transamerica received compensation from the Plan for its recordkeeping services in the form of direct payments and revenue sharing and related kick-back arrangements in which managers for the Plan's investment options annually deducted fees from investment assets and paid those fees to Transamerica.

139. Defendants caused the Plan to pay, directly and indirectly, millions of dollars to Transamerica for recordkeeping services. Transamerica's compensation was excessive and unreasonable given the services provided.

140. Defendants failed to control and monitor these payments to ensure that the payments provided no more than reasonable compensation, failed to negotiate a specific recordkeeping fee for the Plan that was reasonable for the services rendered, failed to investigate the prudence of the revenue sharing system paying for Transamerica's recordkeeping services (instead of a fixed per-participant system), failed to recover for the Plan the amount of revenue Transamerica received that exceeded a reasonable fee for recordkeeping services, and failed to

put the recordkeeping services out for competitive bidding.

141.    Defendants failed to compare the total compensation eligible to be received by Transamerica with the total compensation received by Transamerica and failed to determine that the revenue sharing arrangements deducting fees from the Plan's assets as a percentage of assets were no longer appropriate after the Plan's assets significantly increased in size.

142.    Instead of evaluating the cost of these services in the marketplace, Defendants permitted Transamerica to administer and perform the recordkeeping for the Plan and to collect compensation for these services without meaningful competition.

143.    Defendants breached their duties of prudence and loyalty in violation of 29 U.S.C. § 1104(a) and cost the Plan millions of dollars in excessive administrative fees paid to Transamerica.

**COUNT III**
**Failure to Monitor Fiduciaries**
**(Against Defendant Analog Devices, successor to Linear Technology)**

144.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

145.    As alleged above, Linear Technology was the fiduciary and Plan Administrator of the Plan pursuant to 29 U.S.C. § 1002(21).

146.    Linear Technology was responsible for appointing and removing the Doe Defendant Plan Administrators and had a fiduciary duty to monitor the performance of other fiduciaries, including the Doe Defendant Plan Administrators.

147.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when there is reason to believe the monitored fiduciaries are not performing these obligations.

148.    Linear Technology breached its fiduciary monitoring duties by, among other things

a.      failing to monitor its appointees, to evaluate their performance, or to have a

system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of its appointees' imprudent conduct and omissions with respect to the Plan;

b     failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the widespread use of investment options with excessive fees and service providers receiving excessive fees;

c.     failing to ensure that its appointees investigated and appreciated the availability of comparable and better performing investments that charged significantly lower fees; and

d.     failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plans during the pertinent time period, all to the detriment of participants' retirement savings.

149.   As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered substantial losses per year due to excessive fees and investment underperformance. If Linear Technology had discharged its fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided.

150.   Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Analog Devices, as successor to Linear Technology, is liable to restore to the Plans all losses suffered as a result of Linear Technology's failure to properly monitor the Plan's fiduciaries and subsequent failure to take prompt and effective action to rectify any observed fiduciary breaches.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Michael Bouvy, individually and on behalf of the Class, prays for the following relief:

1  (a)     An order certifying this case as a class action on behalf of the Class defined

2  above, appointing Plaintiff as the representative of the Class, and appointing his counsel as Class

3  Counsel;

4  (b)     An order declaring that Defendants breached their fiduciary duties as described

5  above;

6  (c)     An order finding that Defendants are personally liable to make good to the Plan

7  all losses that the Plan incurred as a result of the conduct described above, including losses to the

8  Plan resulting from imprudent investment of the Plan's assets, and to restore the Plan to the

9  position it would have been if Defendants had fulfilled their fiduciary obligations;

10  (d)     An order awarding actual monetary losses to the Plan, to be allocated among the

11  participants' individual accounts in proportion to the accounts' losses;

12  (e)     An order awarding costs pursuant to 29 U.S.C. § 1132(g);

13  (f)     An order awarding attorneys' fees pursuant to 29 U.S.C. 1132(g) and the common

14  fund doctrine;

15  (g)     An order for equitable restitution and other appropriate equitable monetary relief

16  against Defendants.

17  Respectfully submitted,

18  **MICHAEL BOUVY.**, individually and on behalf of
all others similarly situated,

19

20  Dated: May 10, 2019          By: /s/ Lily E. Hough
One of Plaintiff's Attorneys

21

22  Rafey S. Balabanian (SBN – 315962)
rbalabanian@edelson.com

23  Lily E. Hough (SBN – 315277)
lhough@edelson.com

24  EDELSON PC
123 Townsend Street

25  San Francisco, California 94107
Tel: 415.212.9300

26  Fax: 415.373.9435

27

28